UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
IN RE THE APPLICATION OF JUANA LIVIA   :
DURAN-PERALTA,
                                       :
                                             16 Civ. 7939(JSR)
              Plaintiff/Petitioner,    :
                                             OPINION AND ORDER
              -v-                      :

JOHNNY ANTONIO LUNA,

              Defendant/Respondent.      :                ' V FILED

------------------------------------     x

JED S. RAKOFF, U.S.D.J.

        Petitioner Juana Livia Duran-Peralta, a resident and citizen

of the Dominican Republic, brought this action against respondent

Johnny Antonio Luna, a resident and citizen of the United States,

seeking the return of the parties' minor child ("IM") from the United

States to the Dominican Republic under the Civil Aspects of

International Child Abduction (the "Hague Convention") and the

International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §

9001 et seq. (2000). See Complaint, ECF No. 1; Amended Complaint, ECF

No. 12. IM was born in the Dominican Republic on August 5, 2015. On

October 12, 2015, respondent took IM to the United States. Respondent

has kept IM in the United States since then despite petitioner's

appeals that respondent return IM to the Dominican Republic, which

culminated in this lawsuit. Familiarity with all prior proceedings is

here presumed.

        On May 9, 2017, petitioner moved for summary judgment, ECF

No. 31, but included only a barebones, ten-sentence Rule 56.1

Statement, see ECF No. 32. In support of his opposition to this motion, respondent submitted a declaration attesting to facts never before raised in these proceedings but creating a genuine dispute of material fact. See Declaration of Johnny Antonio Luna ("Luna Decl."), ECF No. 34-4. On August 29, 2017, the Court held an evidentiary hearing that became, without opposition, a bench trial on petitioner's claims. See Transcript dated Aug. 29, 2017 ("Tr.") at 9:7-10. Both petitioner and respondent testified and were provided with an opportunity to present witness testimony and documentary evidence.

Following this hearing/trial, the Court invited the parties to submit proposed findings of fact and conclusions of law and response briefing. See Tr. at 138:15-139:10. While some facts were undisputed, determination of many of the material facts turned on the Court's assessment of the witnesses' credibility, including the Court's examination of their demeanor. Based on these assessments and the submitted written and oral evidence, the Court makes the following findings of fact and conclusions of law.

## Factual Background

The parties offer strikingly different accounts of their relationship. According to petitioner, she and respondent were romantically involved for several years, during which time she became pregnant with IM. Respondent, on the other hand, claims that

2

petitioner served as a surrogate for him and his wife and that he and petitioner were never romantically involved.[1] As detailed below, the Court found the testimony of petitioner considerably more credible than that of respondent and those who testified on his behalf.[2]

According to respondent, after he and his wife decided to look for a surrogate in the Dominican Republic, see Tr. 105:22-106:13, he was put in touch with petitioner, who agreed be their surrogate in exchange for respondent's assistance in bringing her and her 13-year old daughter to the United States, id. at 111:9-15, 113:4-7, 119:4-7, 122:22-123:1, 125:18-126:3 (Luna). Respondent alleged that petitioner "offered herself to [him] . . . many times, not only one time. Many times," id. at 125:15-16, assuring him that she would get pregnant, id. at 108:17-19. Respondent testified that

[1] Respondent raised this surrogacy argument for the first time in his opposition to petitioner's motion for summary judgment. Respondent's own counsel were informed that petitioner allegedly served as a surrogate only after counsel had filed a motion to dismiss. See Tr. at 133:10-20.

[2] The Court had ample reason to doubt the testimony of Justina and Santiago Echavarria in particular. As an initial matter, both are potentially biased in favor of respondent because respondent has been a client of their office "for several years" (albeit as a customer of the travel agent division). Tr. 81:5-7, 83:12-20 (S. Echavarria). In addition, Justina Echavarria and respondent's parents are neighbors in the Dominican Republic. Id. at 61:3-4. Nevertheless, Justina Echavarria was less than forthcoming about her relationship with respondent, claiming that the only time respondent had come to the office before November 5, 2015 was in connection with IM. Id. at 72:19-73:3. And the Court was troubled that Santiago Echavarria struggled to directly answer the questions put to him. See, e.g., id. at 83:6-9.

3

he and petitioner had sex only one time, as a result of which respondent became pregnant with IM. Id. at 109:14-23 (Luna). Respondent also suggested that he never socialized with petitioner before she became pregnant, id. at 103:1-3 (Luna), but this contention is contradicted by his later testimony that, during that time, he sometimes saw petitioner at the home of another woman, id. at 108:11-22.

In addition to the belatedness with which respondent raised his entire "surrogate" story and the many contradictions in respondent's testimony, the Court finds significant that there was no written surrogacy agreement, see id. at 112:15-24 (Luna); that respondent made no effort to help petitioner come to the United States, see id. at 123:2-12 (Luna) (he "wanted to do [his] part" of the alleged bargain but did not); that respondent did not tell his wife that he slept with the alleged potential surrogates until after his deposition in this case, see id. at 120:1-7, 120:23-121:11, 121:24-122:21 (Luna); and that respondent is currently seeking custody of another young child he fathered with a woman living in the Dominican Republic, whom he does not allege served as a surrogate for him and his wife, see Plaintiff's Proposed Findings of Fact and Conclusions of Law Ex. A ("Luna Dep.") at 25:1-20, ECF No. 44. Furthermore, respondent's claim that petitioner bore IM as a surrogate for respondent and his wife was not corroborated by any other evidence, and petitioner credibly denied that respondent had

4

ever asked her whether she would be willing to have a child that she would give up to him and to his wife in the United States. Tr. 30:10-14 (Duran-Peralta).

The Court accordingly finds the following facts based largely on petitioner's testimony. Petitioner, the mother of IM, lives with her eldest daughter in Santo Domingo in the Dominican Republic, where she has lived her entire life. Id. at 10:13-17 (Duran-Peralta). Respondent was also born in Santo Domingo. Id. at 37:20-21 (Duran-Peralta); id. at 106:9-10 (Luna). He currently lives in the United States with his wife, to whom he has been married for about ten years. Id. at 105:16-21, 106:2-4 (Luna). Respondent has five children in addition to IM: a ten-year old child by his wife, three children (aged ten, fourteen or fifteen, and twenty-three) by three different women who live in the United States, and a one-year old child whose mother lives in the Dominican Republic. Luna Dep. at 22-25, 44-47.

Petitioner and respondent met in 2012, when he would stop by the "exchange house" next to where she worked, see Tr. 99:23-24 (Luna), and shortly thereafter began a romantic and sexual relationship. Id. at 10:20-11:2, 11:7-23 (Duran-Peralta). They stopped seeing each other at some point in 2013 but resumed their sexual relationship in or around October 2014. Id. at 12:7-13:22. Throughout their relationship, petitioner knew that respondent was married in the United States. Id. at 16:4-6. While respondent was in the United States, he and petitioner sometimes exchanged affectionate

5

text messages. See, e.g., id. at 126:20-21 (Luna) ("[W]e're going to see each other soon. I can't wait to get there."); id. at 127:13 ("Love, tell me what you want to --"); id. at 128:4-6 ("I remember that when you spoke, I was looking at you with desire. I wanted to eat you up.").[3]

When she became pregnant, petitioner quit her job and respondent financially supported her. Id. at 33:15-17 (Duran-Peralta). In June 2015, respondent rented a house for petitioner in anticipation of IM's birth. Id. at 17:12-18:1, 33:9-11 (Duran-Peralta); id. at 111:9-12 (Luna). IM was born in the Dominican Republic on August 5, 2015. Id. at 17:3-4; Defendant's Proposed Findings of Fact and Conclusions of Law ("Def. Br.") at 3 ¶ 25, ECF No. 45. Respondent was not in the Dominican Republic when IM was born but he visited her there for several days about a week after she was born. Id. at 18:13-19:2 (Duran-Peralta).

IM had medical problems after her birth, including neurological complications from a knotted umbilical cord and a skin condition called scabiasis. Id. at 19:20-20:6 (Duran-Peralta). Respondent told petitioner that he did not want IM to go to doctors in Santo Domingo, id. at 21:9-13, and the parties discussed the possibility of seeking medical treatment for IM in the United States,

---

[3] The Court did not find credible respondent's explanation that he sent these text messages only because he "can't be nasty to somebody who is actually doing something, a huge favor for me. I can't be a cruel guy." Tr. at 128:22-24.

id. at 20:14-17 (Duran-Peralta); see also JUANA0043 (petitioner asking respondent whether he looked into the "doctor thing") (August 19, 2015 text message). Respondent told petitioner that his sister, who is a doctor, would see IM in New York. Id. at 20:25-21:1 (Duran-Peralta); see also JUANA00045 (respondent telling petitioner that he would send IM's sleep schedule to his sister) (September 5, 2015 text messages).[4] Accordingly, in September, petitioner signed what she understood to be an authorization permitting respondent to bring IM to the United States. Tr. 38:12-15. This "authorization" most likely was an application for an American passport, which petitioner and respondent filled out at the law office of Justina Echavarria. Id. at 61:14-16 (J. Echavarria).

In October 2015, respondent visited the Dominican Republic again. When he returned to the United States, on October 12, 2015, he brought IM with him. Tr. 21:18-20 (Duran-Peralta); see also Def. Br. at 5 ¶ 44. Petitioner believed that respondent was taking IM to the United States for just two months for the sole purpose of receiving medical treatment and that he would return her to the Dominican Republic in December. See id. at 20:23-21:25.

---

[4] Petitioner did not provide the Court with written translations of these text messages received as Plaintiff's Exhibit 1. Because these text messages comprised the majority of the exhibits introduced at trial, the Court thought it necessary to consider them in its review of the evidence. To that end, the Court relied on translations of the messages generously provided by the Southern District of New York Interpreters Office.

In November 2015, respondent returned to the Dominican Republic (without IM) and told petitioner that he needed a new authorization to take IM to doctors in the United States. Id. at 22:6-12. Petitioner and respondent made another visit to Justina Echavarria's law office on November 5, 2015 and signed a document that petitioner believed authorized respondent to seek medical treatment for IM in the United States but in fact provided that petitioner waived her maternal rights over IM (the "Release").

While IM was in the United States, petitioner "was communicating constantly with" respondent. Id. at 24:19. She inquired about the status of the doctors' visits and asked respondent to send pictures and videos of IM, which he did. See, e.g., JUANA00048-50 (text messages dated October 17-20, 2015); JUANA00054 (text messages dated November 18-20, 2015). She also "constantly" sent "him messages asking him why [he] didn't bring the girl back." Id. at 24:19-23; see also JUANA0060 (text message dated December 26, 2015); JUANA00065 (text message dated December 27, 2015). Respondent provided various reasons for why he could not bring IM back, such as that "he didn't have any money to travel back to Santo Domingo, [or] that he had too much work." Id. at 25:4-5. Respondent has never returned to the Dominican Republic with IM. See id. at 24:14-16. Petitioner filed the instant action on October 11, 2016. See Complaint, ECF No. 1.

## Legal Analysis

The Hague Convention, to which both the United States and the Dominican Republic are signatories,[5] was enacted "'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence.'" Gitter v. Gitter, 396 F.3d 124, 129 (2d Cir. 2005) (quoting Hague Convention, Preamble, 51 Fed. Reg. at 10,498). The Convention "places at the head of its objectives the restoration of the status quo, by means of the prompt return of children wrongfully removed to or retained in any Contracting State." Gitter, 396 F.3d at 130 (internal quotation omitted); see also Hague Convention, art. 1 ("The objects of the . . . Convention are: (a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."). ICARA implements the Hague Convention. See Ozaltin v. Ozaltin, 708 F.3d 355, 359-360 (2d Cir. 2013). Significantly, "[t]he Convention and [ICARA] empower courts in the United States to

_____

[5] See, e.g., Moreno v. Basilio Penn, No. 15-CV-2372, 2015 WL 4992005, at *6 & n.10 (S.D.N.Y. Aug. 19, 2015) (Dominican Republic); Gitter v. Gitter, 396 F.3d 124, 130 & n.5 (United States) (citing Hague Conference on International Law: Report on the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction, 33 I.L.M. 225, 225 (1994)).

9

determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4).

"[I]n order to prevail on a claim under the Hague Convention a petitioner must show that (1) the child was habitually resident in one State and has been removed or retained in a different State," and that the removal or retention was "wrongful" because "(2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of removal or retention." Gitter, 396 F.3d at 130-131.[6] A petitioner must make these showings by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1).

---

[6] Article 4 of the Convention provides that "[t]he Convention shall apply to any child who was habitually resident in a Contracting State immediately before any breach of custody or access rights." Hague Convention, art. 4. Article 3 of the Hague Convention provides that:

> The removal or the retention of a child is to be considered wrongful where—
>
> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph *a* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

With respect to the first prong, the Hague Convention does not itself provide any definition of "habitually resident." Gitter, 396 F.3d at 134. Courts in the Second Circuit use the following approach in determining a child's state of habitual residence:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

Id. When a child is younger, courts place more emphasis on the intentions of the parents. See, e.g., Holder v. Holder, 392 F.3d 1009, 1020-1021 (9th Cir. 2004) ("[I]t is practically impossible for a newborn child, who is entirely dependent on its parents, to acclimatize independent of the immediate home environment of the parents."); Whiting v. Krassner, 391 F.3d 540, 550 (3d Cir. 2004) ("[W]hen the situation involves a very young child . . . the shared intent of the parents in determining the residence of their children [is] of paramount importance.").

---

Hague Convention, art. 3.

In determining IM's habitual residence, the preliminary question the Court must resolve is whether petitioner's signing the Release demonstrates that she intended IM to remain in the United States permanently.[7] Respondent argues that that the Release, "together with [the] circumstances surrounding its signing by the parties, . . . serves as a manifestation of the parties' shared intent as of the last time they shared an intent with respect to the custody of I.M." Def. Br. at 15 ¶ 130. Notwithstanding the lack of clarity regarding the circumstances surrounding the execution of the Release, the Court is left with little doubt that petitioner did not, in signing the Release, anticipate – let alone intend – that respondent would retain IM in the United States permanently.

The two-page, as-signed Release provides that, "I [petitioner] want to declare further that I waive all of my rights over the girl; and declare, that this is in the best interest of the girl." Declaration of Valerie K. Ferrier in Support of Defendant's

---

[7] This is true even though respondent removed IM from the Dominican Republic prior to the signing of the Release. "[T]he text of the Convention directs courts to the time 'immediately before the removal or retention,'" In re Kim, 404 F. Supp. 2d 495, 512 (S.D.N.Y. 2005) (quoting Hague Convention, art. 3), but the Release is probative of whether the parties' had a shared intention on the earlier date of removal. In addition, that the Release is invalid under Dominican law, see Memorandum dated May 30, 2017 at 7, ECF No. 39, is not dispositive. See Guzzo v. Cristofano, 719 F.3d 100, 110 (2d Cir. 2013) ("Regardless of whether the document is enforceable in [state] court, it is nevertheless clearly probative of the parties['] 'last shared intent' for the purposes of determining habitual residence under ICARA." (internal quotation omitted)).

Motion to Dismiss ("Ferrier Decl.") Ex. B, ECF No. 15 (translation of
Release); see also Def. Trial Ex. 2 (original Release). The Release
further provides that petitioner "designate[s] [respondent] Johnny
Antonio Luna as a qualified and adequate adult competent to perform
any proceedings to retain the girl if [her] rights as mother are
terminated." Ferrier Decl. Ex. B. The Release also identifies Luna's
address in New York State. Id.

Although respondent credibly testified that she did not read
the Release, Tr. 23-24, respondent is not without evidence that she
might have understood its import. Before petitioner signed the
Release, someone from the Echavarrias' law firm asked Ramon Antonio
Gilminjete, an attorney and notary, to notarize the document. Id. at
91:11-15 (Gilminjete); see also Ferrier Decl. Ex. B (signature of
Gilminjete as notary). Gilminjete – who was perhaps the only one of
respondent's witness whom the Court found half-way credible –
testified that he has known petitioner since she was born. Tr. 90:15-
20-24 (he knows "her mother, her father, her family"). When
Gilminjete arrived at the office, he read the document immediately
and asked petitioner "if she knew what she was signing, what she was
about to sign, because she hadn't signed it yet," id. at 91:23-92:4,
and she responded that she knew what she was signing, id. at 92:5-6.
Gilminjete told her "it says that she is giving away the custody of
the child to the father," and that it was "too strong." Id. at 92:20-
22. Respondent again told him that "she knew what she was doing." Id.

13

at 92:24-25. Nonetheless, Gilminjete took the document with him to his office "to maybe give her the opportunity to think it through." Id. at 93:1-2; id. at 69:16-21 (J. Echavarria). Petitioner called him "the next day or two days later" to tell him that he could give the document to respondent. Id. at 93:4-8. Gilminjete then returned the Release to the Echavarrias' office, which sent the document to get an apostille from the ministry in the Dominican Republic (which is akin to a verification). Id. at 69:22-70:9 (J. Echavarria); see Def. Ex. 3 (apostille).

However, even assuming arguendo that, contrary to her testimony at trial, petitioner was aware that the Release waived her maternal rights – either because she read the document or because Gilminjete informed her of the document's terms – the evidence still does not support a finding that petitioner ever intended IM to live in the United States.[8] Rather, petitioner was told, and believed, that she was signing the Release so that IM could be seen by doctors in the United States. Tr. 23:22-24:3 (Duran-Peralta).

---

[8] Petitioner is able to read Spanish, the language in which the document was written, but she credibly testified that she did not read the document before she signed it. Tr. 57:11-14, 24:5-6 (Duran-Peralta). The Court found her testimony more credible than that of Justina Echavarria and Santiago Echavarria (Justina's husband, id. at 83:21-25), who testified that petitioner read the Release, id. at 68:11-15 (J. Echavarria), and "expressed" that the purpose of the Release was to give custody to the respondent so he could keep IM in the United States, id. at 84:1-17 (S. Echavarria).

14

The Second Circuit's opinion in Guzzo v. Cristofano is instructive. 719 F.3d 100 (2d Cir. 2013). There, the Second Circuit held that a separation agreement supported a finding that the parents intended their child to live in the United States because petitioner "acknowledged at trial that when he signed the Agreement he understood (1) its terms; (2) that it provided for the child's residence in New York; and (3) that it would be legally binding," notwithstanding petitioner's "hope[] to reconcile with the Mother," in which event the terms of the agreement would be revisited." Id. at 104.

There is no evidence that petitioner actually "understood" her execution of the Release as consent to IM's living with respondent in the United States. Unlike the Guzzo separation agreement, the Release does not explicitly provide that IM would live in New York. Indeed, it is silent on IM's future residence. By contrast, the Guzzo separation agreement both stipulated that the child would attend school in White Plains, New York and established a visitation schedule. 719 F.3d at 104; see also Guzzo v. Cristofano, No. 11-CV-7394, 2011 WL 6934108, at *9 (S.D.N.Y. Dec. 30, 2011) (finding that the child's habitual residence changed to the United States because "[f]irst, and most significantly, the parties documented their shared intention in a Separation Agreement, which expressly contemplated that the child would live and attend school in New York with Respondent." (emphases added)).

15

To be sure, the Release could be read as implying that IM will live in the United States, but there is no evidence that petitioner drew this inference. Petitioner was not represented by counsel when she signed the Release,[9] whereas in Guzzo, both parties were represented by counsel throughout the negotiation of the separation agreement, Guzzo, 2011 WL 6934108, at *2. Gimlinjete may have explained to petitioner that by signing the Release, she gave custody to respondent, see Tr. 92:20-22, but he apparently did not actually explain to her that the practical effect of her waiving custody would be that respondent would take IM to the United States.

There is abundant evidence, on the other hand, that petitioner signed the Release so that respondent could take IM to doctors in the United States, id. at 23:25-24:1, and that respondent represented to her that he would bring IM back to the Dominican Republic in December, id. at 23:14-17. In addition to petitioner's testimony, the parties' text message communications while IM was in the United States confirm that petitioner believed that respondent

---

[9] Based on the evidence presented at trial, the Court finds inaccurate respondent's assertion that "petitioner was represented at the signing [of the Release] by her own attorney, who explained to her the contents of the waiver, and the implication of signing it." Defendant's Rule 56.1 Counter-Statement of Facts ¶ 8, ECF No. 35; Declaration of Johnny Antonio Luna ¶ 6, ECF No. 34-4. Although Gimlinjete may have offered petitioner advice as a family friend, he did not actually enter into an attorney-client relationship with her. Rather, he was retained by respondent's attorneys to notarize the Release.

16

had taken IM to the United States temporarily to visit doctors. On October 15, 2015, petitioner asked respondent "let me know about the baby when she is taken to the doctor," to which respondent replied, "I'll let you know." JUANA0048. She asked again on October 22, October 30, and November 20 that respondent let her know if he took IM to the doctor. Id.; JUANA00051; JUANA0054. In late December, petitioner asked respondent whether he had a date planned to bring IM to the Dominican Republic, as he had told her he would. See JUANA00060; JUANA00062 ("You know that you took her to have a checkup at the doctor and that you were going to bring her right away."); JUANA00065 ("You know very well that the baby had health problems, and that is why I allowed you to take her to NY; so that your sister could get her checked, because the doctors didn't resolve it here. You told me the day before you left that if the checkups were finished by the end of November, you would bring her the beginning of December already.").

    While the matter is not free from doubt, the Court, based not only on the testimony and other evidence themselves but also on its assessment of the witnesses' demeanor, concludes that petitioner has demonstrated by a preponderance of the evidence that she did not intend, when she signed the Release or at any time before then, that the United States would become IM's habitual residence and that rather, petitioner continued to believe that respondent would return IM to the Dominican Republic.

It should also be noted that, even on respondent's claim that petitioner wanted IM to live in the United States, it was on the condition that respondent fulfill his promise to help petitioner and her elder daughter move to the United States as well. Such a conditional intent, in the absence of fulfillment of the condition, would not support a finding of intent to change IM's habitual residence. See, e.g., Maxwell v. Maxwell, 588 F.3d 245, 251-252 (4th Cir. 2009) (collecting cases where "courts have refused to find a change in habitual residence because one parent intended to move to the new country of residence on a trial or conditional basis."); Moreno v. Basilio Penn, No. 15-CV-2372, 2015 WL 4992005, at *10 (S.D.N.Y. Aug. 19, 2015) ("Even if a parent has consented to removal, the retention of the child beyond 'certain conditions or circumstances' agreed upon by the parents may constitute wrongful removal.'" (quoting Baxter v. Baxter, 423 F.3d 363, 370 (3d Cir. 2005))).[10]

The Court next finds that the Dominican Republic was IM's habitual residence at the time of her removal. To begin with, the

---

[10] In any event, there is no evidence other than respondent's testimony that petitioner expected respondent to bring her and her elder daughter to the United States - either in exchange for her agreeing to serve as a surrogate or otherwise. To the contrary, petitioner testified that she believed respondent would continue paying for the house that he rented and otherwise supporting IM throughout IM's life, implying that she intended to raise IM in the Dominican Republic. Tr. 34:11-14.

18

parties shared an initial intent that IM reside in the Dominican Republic. In the years preceding IM's birth, the Dominican Republic was the site of the parties' relationship. See Delvoye v. Lee, 329 F.3d 330, 334 (3d Cir. 2003) (explaining that where a petitioner and respondent had "lived together in in Mexico for nearly a year before the child was born, a basis existed for finding the child's habitual residence to be in Mexico."). Indeed, there is no evidence that petitioner even once visited respondent in the United States. See Guzzo, 2011 WL 6934108, at *6 (finding confirmation that parents intended child to live in New York in "the nature of the parties' relationship" prior to the child's removal, specifically that petitioner was opening to relocating permanently to New York while respondent was not open to moving to Italy). When petitioner became pregnant, respondent financially supported her in the Dominican Republic, including by paying the rent on her house in Santo Domingo. Therefore, there is sufficient evidence to conclude that the parties shared an intent that the Dominican Republic be IM's habitual residence.

However, "[t]he shared intent of the parents is not dispositive of a child's habitual residence," and "[a] court must additionally examine the evidence to determine if it unequivocally points to the child having acclimatized." Gitter, 396 F.3d at 135. But the Court finds that IM was "acclimatized" to the Dominican

19

Republic at the time of her removal.[11] See Ovalle v. Perez, 681 F.
App'x 777, 784 (11th Cir. 2017). Here, prior to IM's entry into the
United States, she had never lived anywhere other than the Dominican
Republic. She was living in a house with her mother and older sister,
neither of whom had United States citizenship. See Tr. 34:6-156; In
re Koc, 181 F. Supp. 2d 136, 140 (E.D.N.Y. 2001) (finding that
Poland, rather than the United States, was the child's habitual
residence in part because the mother did not have permanent resident
alien status in the United States). She also had been seen by doctors
in the Dominican Republic. See id. at 20:1, 21:9-10. "Were any
greater quantum of contacts with a particular location required to
establish an initial habitual residence, parents could freely engage
in a continuous game of abduction ping pong." Ovalle, 681 F. App'x at
784.

By contrast, respondent introduced no meaningful evidence
into the record that IM has acclimatized to the United States. To
give more than marginal weight to the fact that IM has been in the
United States for a little over two years would "would be contrary to
the Hague Convention's goal of discouraging abductions by denying to

---

[11] Even in the absence of a last shared intent, this acclimatization,
on its own, would be sufficient to establish habitual residence. The
Court agrees with Judge Weinstein that where "the parents disagree
regarding the country where the child should live in the future, the
child's pre-removal residence is ultimately crucial in making a
custody determination." A.A.M. v. J.L.R.C., 840 F. Supp. 2d 624, 636
(E.D.N.Y. 2012).

20

the abductor any legal advantage from the abduction." Kijowska v. Haines, 463 F.3d 583, 588-589 (7th Cir. 2006); see also Diorinou v. Mezitis, 237 F.3d 133, 142 (2d Cir. 2001) ("[A] parent cannot create a new 'habitual residence' by the wrongful removal and sequestering of a child." (internal quotation omitted)); see also Miller v. Miller, 240 F.3d 392, 400 (4th Cir. 2001).[12] Therefore, the Court concludes that the Dominican Republic was IM's habitual residence at the time of removal.

With regard to the second and third prongs of petitioner's claim, there can be no genuine dispute that petitioner had lawful custody and would be exercising those rights but for IM's removal.[13] Nevertheless, respondent argues that petitioner legally waived her custody rights under Dominican law and that his removal of IM was therefore not "wrongful." This argument is foreclosed by the Court's previous memorandum opinion, which found that the Release has no force of law in the Dominican Republic. See Memorandum dated May 30, 2017 ("May Mem."), ECF No. 39. To the contrary, that opinion

---

[12] The same is true of the evidence that IM is cared for all day by respondent's wife, see Tr. 117:10-14, since invariably a child under the age of three will be looked after throughout the day wherever he or she lives.

[13] The Convention "defines a wrongful removal as one that 'is in breach of rights of custody . . . under the law of the State in which the child was habitually resident immediately before the removal or retention' and that occurred at a time when 'those rights were actually exercised . . . or would have been so exercised but for the removal or retention.'" Ozaltin v. Ozaltin, 708 F.3d 355, 366 (2d Cir. 2013) (quoting Hague Convention, art. 3).

specified that "petitioner has custody rights over IM under Dominican law, and would be exercising those rights but for IM's presence in the United States, [such that] respondent's retention of IM is 'wrongful' under the Hague Convention." Id. at 7.

Respondent tries to avoid this conclusion by relying on a "Certificate That No Custody Agreement Is In Place." See Def. Br. at 12 ¶ 108. This certificate, dated February 1, 2016, states that as "there has been no agreement as to the custody of the minor [IM] . . . she shall remain in the same status as she presently is under the care and protection of her father, until her mother empowers the judge of the civil court for children and adolescents of the La Vega judicial district, to issue a final judgment on the matter." Def. Trial Ex. 1 (translation); see Def. Br. at 13 ¶ 114. Contrary to respondent's contention, this certificate does not provide that he has sole custody of IM. Instead, it provides that - as this Court held - there is no final judgment as to which parent (or parents) has custody. In the absence of such final judgment, petitioner has custody of IM. See May Mem. at 6-7.

In short, petitioner has established her claim under the Hague Convention. "If the court determines that a petitioner has satisfied this burden as to the core two elements - habitual residence and wrongful retention - the court must ordinarily 'order the return of the child forthwith.'" Mota v. Castillo, 692 F.3d 108, 113 (2d Cir. 2012) (quoting Hague Convention, art. 12).

However, if the respondent can successfully establish that any of the four statutory exceptions applies, then a court is not bound to order the child's return. Id. The Court therefore considers whether respondent has established that any exception to the Convention applies. "[T]he exceptions are to be narrowly read." Id. (citing Blondin v. Dubois, 189 F.3d 240, 246 (2d Cir. 1999)).

Respondent argues that two exceptions apply. First, under Article 13 of the Hague Convention, the right to a child's return secured by the Hague Convention is extinguished if "the person . . . having the care of the child . . . consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13.[14] The same factual findings that preclude respondent from showing rightful removal also preclude finding consent or acquiescence. The Court credits petitioner's testimony that she did not anticipate that the Release would result in IM's permanent residence in the United States. Therefore, she did not consent to or acquiesce in respondent's removal of IM.

Respondent next argues that even if petitioner has stated a valid claim under the Convention, IM is now settled in the United

_____

[14] Respondent also suggests that petitioner has "waived" her rights under the Convention by "knowingly and intentionally waiv[ing] her parental rights" in signing the Release. See Def. Br. at 13 ¶ 116. There is no such "waiver" exception to the Convention. Moreover, even if this argument could be properly slotted into one of the Convention's exceptions, it fails for the same reasons that petitioner has demonstrated wrongful removal.

States such that sending her to the Dominican Republic would not be in her best interest. Def. Br. at 16 ¶ 133. But this exception is not applicable here. Article 12 of the Hague Convention allows (but does require) a judicial or administrative authority to refuse to order the return of a child on the ground that the child is settled in its new environment only if more than one year has elapsed between the abduction and the petition for return. See Hague Convention, art. 12; Blondin, 238 F.3d at 164. As petitioner filed her complaint on October 11, 2016 - less than a year after the abduction - this exception is inapplicable.

For the foregoing reasons, the petition is granted and the Court orders that IM be returned to the Dominican Republic forthwith. Petitioner seeks costs pursuant to 22 U.S.C. § 9007(b)(3), which provides that "[a]ny court ordering the return of a child pursuant to an action brought under [ICARA] shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." The parties are directed to jointly convene a call to chambers by no later than December 29, 2017 to establish a briefing schedule for the issue of costs.

SO ORDERED.

Dated:  New York, NY
        December 21, 2017

JED S. RAKOFF, U.S.D.J.